UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------x
BOARD OF EDUCATION OF THE :
YORKTOWN CENTRAL SCHOOL :
DISTRICT, :
               Plaintiff, :
: **OPINION AND ORDER**
v. :
: 17 CV 6542 (VB)
C.S. and S.S., individually and on behalf of :
M.S., a minor, :
               Defendants. :
--------------------------------------------------------------x

Briccetti, J.:

    Plaintiff Board of Education of the Yorktown Central School District (the "District"), brings this action pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400, et seq. Defendants C.S. and S.S. are the parents ("Parents") of M.S., a child with a disability as defined under the IDEA. The District seeks reversal of a decision of a State Review Officer'("SRO"), dated July 5, 2017, which ordered the District to provide direct funding or reimbursement of M.S.'s tuition at the Eagle Hill School ("Eagle Hill") for the 2016–2017 school year. The Parents seek to uphold the SRO's decision.

    Now pending are the parties' cross-motions for summary judgment. (Docs. ##21, 24).

    For the reasons set forth below, the Parents' motion is GRANTED and the District's motion is DENIED.

    The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331.

## BACKGROUND

I.    Statutory Framework

    The IDEA was enacted to promote the education of disabled children. 20 U.S.C. § 1400(d)(1)(A); see Bd. of Educ. of the Hendrick Hudson Cent. Sch. Dist. v. Rowley, 458 U.S.

1

176, 179 (1982) (interpreting predecessor statute to IDEA). States receiving public funds are required to provide a free appropriate public education ("FAPE") to children with disabilities. 20 U.S.C. § 1412(a)(1)(A). Public school districts must provide "'special education and related services' tailored to meet the unique needs of a particular child, [which are] 'reasonably calculated to enable the child to receive educational benefits.'" Walczak v. Fla. Union Free Sch. Dist., 142 F.3d 119, 122 (2d Cir. 1998) (quoting 20 U.S.C. § 1401(a)(18) and Bd. of Educ. of the Hendrick Hudson Cent. Sch. Dist. v. Rowley, 458 U.S. at 207).

States have an obligation under the IDEA to identify, locate, and evaluate "[a]ll children with disabilities residing in the State" to determine whether they require special education and related services. 20 U.S.C. § 1412(a)(3)(A); see Handberry v. Thompson, 446 F.3d 335, 347 (2d Cir. 2006). This so-called "child find" obligation extends to children who are "suspected of being a child with a disability." 34 C.F.R. § 300.111(c)(1).

The IDEA also requires states to create an individualized education program ("IEP") for each disabled student. See 20 U.S.C. § 1412(a)(4); see also Frank G. v. Bd. of Educ. of Hyde Park, 459 F.3d 356, 363 (2d Cir. 2006) ("The key element of the IDEA is the development of an IEP for each handicapped child."). The IEP is a "comprehensive statement of the educational needs of a handicapped child and the specially designed instruction and related services to be employed to meet those needs." Sch. Comm. of Burlington v. Dep't of Educ., 471 U.S. 359, 368 (1985) (citing 20 U.S.C. § 1401(19)).

In New York, the responsibility for developing IEPs is assigned to local Committees on Special Education ("CSE"). N.Y. Educ. Law § 4402(1)(b)(1); R.E. v. N.Y.C. Dep't of Educ., 694 F.3d 167, 175 (2d Cir. 2012). "The CSE must consist of: the parents of the student in question; the student's regular or special education teacher; a school psychologist; a district

representative 'qualified to provide or administer or supervise special education and . . . knowledgeable about the general curriculum and the availability of resources of the school district"; and an additional parent representative, among others. FB v. N.Y.C. Dep't of Educ., 923 F. Supp. 2d 570, 577 (S.D.N.Y. 2013).

The IDEA requires a school district to send prior written notice to the parents of a child whenever the school district proposes or refuses to initiate or change "the identification, evaluation, or educational placement of the child, or the provision of a [FAPE] to the child." 20 U.S.C. § 1415(b)(3). If the parents believe the state failed to provide a FAPE to a disabled child, the parents may enroll the child in a private school and seek reimbursement for the cost of the private school from the local board of education. See 20 U.S.C. § 1412(a)(10)(C); Sch. Comm. of Burlington v. Dep't of Educ., 471 U.S. at 369–70, 374. The parents must provide notice ten business days before removing the child from the public school. 20 U.S.C. § 1412(a)(10)(C)(iii).

In New York, parents seeking such reimbursement must then file a "due process complaint" challenging the appropriateness of the IEP. FB v. N.Y.C. Dep't of Educ., 923 F. Supp. 2d at 577. A school district must respond within ten days of receiving the complaint, unless the school district has already sent prior written notice to the parent regarding the subject matter of the due process complaint. 20 U.S.C. § 1415(c)(2)(B)(i)(I); 34 C.F.R. § 300.508(e). The school district's response must address the issues raised in the complaint and include specific information outlined in 20 U.S.C. § 1415(c)(2)(B)(i).

Separately, a school district has fifteen days from receiving notice of the parents' due process complaint to convene a resolution meeting. 20 U.S.C. § 1415(f)(1)(B)(i); 34 C.F.R. § 300.510(a)(1). "The purpose of the meeting is for the parent of the child to discuss the due

process complaint, and the facts that form the basis of the due process complaint, so that the [school district] has the opportunity to resolve the dispute that is the basis for the due process complaint." 34 C.F.R. § 300.510(a)(2). The school district has thirty days from receipt of the complaint to "resolve[] the complaint to the satisfaction of the parents." 20 U.S.C. § 1415(f)(1)(B)(ii). If the parties resolve the complaint, they must execute a legally binding agreement, signed by the parent and a school district representative, that sets forth the resolution. Id. § 1415(f)(1)(B)(iii). If the parties fail to resolve the complaint, they may proceed with a due process hearing. Id. § 1415(f)(1)(B)(ii).

An impartial hearing officer ("IHO") conducts the due process hearing on the parents' complaint. See N.Y. Educ. Law § 4404(1). A board of education is required to reimburse parents for private educational services if: (i) the board fails to establish the student's IEP provided a FAPE; (ii) the parents establish their unilateral placement was appropriate; and (iii) equitable considerations favor the parents' claim. See Florence Cty. Sch. Dist. Four v. Carter, 510 U.S. 7 (1993); M.W. ex rel. S.W. v. New York City Dep't of Educ., 725 F.3d 131, 135 (2d Cir. 2013). The IHO's decision may be appealed to an SRO at the New York State Education Department. See N.Y. Educ. Law § 4404(2); see also 20 U.S.C. § 1415(g). The SRO's decision may then be challenged in federal court. See 20 U.S.C. § 1415(i)(2)(A).

II.   Factual Background

The parties have submitted briefs, statements of material fact pursuant to Local Civil Rule 56.1, and the record and exhibits from the proceedings below, which reflect the following factual background.[1]

---

[1] "Tr." refers to the transcript of the IHO hearing; "Dist. Ex." refers to the exhibits submitted by the District at the IHO hearing; and "Parents Ex." refers to the exhibits submitted by the Parents at the IHO hearing. In addition, "IHO Dec." refers to the IHO Decision, dated April 23, 2017, and "SRO Dec." refers to the SRO Decision, dated July 5, 2017.

A.   CSE Meeting

At all relevant times, M.S. was a twelve-year-old student diagnosed with Tourette syndrome, attention deficit hyperactivity disorder, a developmental coordination disorder, a central processing disorder, dyscalculia, and, according to the Parents, dyslexia.

On June 9, 2016, the CSE convened to develop M.S.'s IEP for the 2016–2017 school year, in which M.S. would be in seventh grade. At the CSE meeting, the parties discussed what class size was appropriate for M.S.

The parties dispute whether the CSE concluded a 15:1+1 (fifteen students, one special education teacher, and one teaching assistant ) class size was appropriate, or whether the CSE merely discussed placing M.S. in a 15:1+1 class. Nonetheless, the Parent at the CSE meeting testified she left the meeting under the impression that the class size would be 15:1+1. In addition, the Parent visited the school at the end of June 2016 and met with the teachers, who reiterated that the class size would be 15:1+1.

B.   June 2016 IEP

On August 17, 2016, the Parents sent a letter to Michael Rosen, the District's Director of Pupil Personnel Services, stating they were removing M.S. from public school and intended to enroll M.S. at Eagle Hill for the 2016–2017 school year, where M.S. had attended the previous school year. The Parents disagreed with the CSE's recommendations and believed, among other things, that the District failed to recommend an appropriate smaller class for M.S. In addition, the Parents stated they had not received a copy of the IEP and were not able to review the CSE's final recommendations.

In response, the District sent the Parents a copy of the IEP dated June 9, 2016, and a prior written notice, also dated June 9, 2016, which the Parents received on approximately August 30

or 31, 2016. The June 2016 IEP recommended M.S. for a 12:1+1 special class placement for English, math, social studies, and science. The prior written notice likewise states: "Based on the information presented the committee recommends a special class, 12-1+1 for English, Social Studies, Science, and Math, with related services as per the IEP." (Parents Ex. C at 1).

Despite what the June 2016 IEP and the prior written notice recommended, it is undisputed the District was unable to provide a 12:1+1 class size for M.S. at the beginning of the 2016–2017 school year. Moreover, the District contends the references to a 12:1+1 class size were clerical errors carried over by using the prior year's IEP as a template. The Parent testified that when she saw that the IEP included a 12:1+1 class size, she "got confused," and thought the District had either made a mistake or changed their recommendation. (Tr. at 1287).

### C. Due Process Complaint and Resolution Meeting

M.S. began the 2016–2017 school year at Eagle Hill on September 6, 2016.

On September 26, 2016, the Parents filed a due process complaint requesting a due process hearing because the District failed to provide M.S. a FAPE for the 2016–2017 school year. One of the bases for the Parents' request was that the District failed to recommend an appropriate class size. Specifically, the September 26, 2016, due process complaint states:

> The District recommended a 12:1+1 class for MS. However, MS has been in a highly intensive 4:1 tutorial class at least two periods per day with four students and one teacher while at Eagle Hill. The District merely stated as its rationale: "[b]ased on the information presented to the committee [sic] recommends a special class, 12-1+1." The District did not consider any other class size options for MS. Moreover, when the Parents visited the proposed program they learned the Student's class would have 15 students, not 12.
>
> . . . .
>
> The District failed to develop an IEP that it could implement for the Student. The District's teacher told the Parent that its seventh grade classes contain 15 students,

not 12.  The District developed an IEP that recommended a 12:1:1 for the Student, but according to its staff it did not have a program that could implement the IEP.

(Parents Ex. A at 7–8) (alterations in original).

The District held a resolution meeting on October 7, 2016, at which Mr. Rosen stated the provision for a 12:1+1 class was a mistake, and the IEP should have read that the class size was 15:1+1.  Whereas Rosen testified that the IEP was corrected to reflect the 15:1+1 class size as part of the resolution meeting, the Parent who attended the resolution meeting testified she did not agree to change the IEP at the resolution meeting and did not sign any consent form to change the IEP.

According to the Parent, Rosen said he would change the class size in the IEP.  Rosen also testified that at some point in mid-October after the resolution meeting, the District developed a second IEP that changed the class size from 12:1+1 to 15:1+1.

D. October 2016 IEP

On October 21, 2016, the District provided a due process response.  Its letter stated, "It is the post-Resolution Session IEP that is the relevant IEP to be examined for its appropriateness in the instant hearing."  (Dist. Ex. 3 at 1).  As to the Parents' claim that the District failed to recommend an appropriate class size for M.S., the District responded:  "To the extent that the 2016-2017 IEP misidentified the class sizes recommended for student, such mistake was corrected at the Resolution Session and the correct size of special education classes are identified on the IEP issued as a result of the Resolution Session."  (Id. at 3).

The Parents state they did not receive a copy of the IEP referenced in the October 21, 2016, due process response letter until November 1, 2016.  Attached to the October 2016 IEP was a cover letter dated October 27, 2016.

The revised October 2016 IEP recommended a class size of 15:1+1 (except for one mention of the class size in the comments to the IEP, which still read 12:1+1). The District also sent an updated prior written notice, dated June 9, 2016, which states: "Based on the information presented the committee recommends a special class, 15-1+1 for English, Social Studies, Science, and Math with related services as per the IEP." (Dist. Ex. 1 at 1).

On November 1, 2016, the Parents signed an enrollment agreement with Eagle Hill for the 2016–2017 school year.

### E. Hearing and Decisions

On December 5, 2016, the Parents filed a second due process complaint, this time alleging a deprivation of FAPE based on the October 2016 IEP. The Parents contended that the District failed to have an IEP it could implement at the start of the 2016–2017 school year because it could not offer the 12:1+1 class size it had recommended in the June 2016 IEP. Moreover, the Parents contended the District had changed the recommendation to a 15:1+1 class size, which they felt was too large to provide M.S. the support she needed. The December 5, 2016, due process complaint states:

> When the Parents received the IEP on August 30, 2016, they believed that the District's recommendation was a 12:1:1 class based on the discussions at the IEP meeting and based on what the IEP stated. The Parents only learned that the District planned to change the IEP recommendation when they attended the resolution session. However, they required this information prior to the start of the school year in order to make an informed decision of what to do for the 16/17 school year.

(Parents Ex. LL at 12).

The IHO consolidated the Parents' two due process complaints and held six hearings. At one of the hearings, the IHO entered the October 2016 IEP into evidence over the Parents' objection.

On April 23, 2017, the IHO issued a decision finding the District had provided M.S. a FAPE. The IHO held:

> While it is apparent that the District did not intend to implement the 12:1+1 class size provision of the IEP it developed on 6/9/16, it is equally clear that this class size was not acceptable to the parent. Even if the IEP had not been "corrected" and it could have been provided, that class size ratio was not acceptable to the parent.

(IHO Dec. at 19).

The Parents appealed, and on July 5, 2017, the SRO reversed the IHO's decision. The SRO held there was insufficient evidence that the District had provided the Parents with the October 2016 IEP during the resolution period, which ended on October 26, 2016. Therefore, the SRO, relying on R.E. v. N.Y.C. Dep't of Educ., 694 F.3d 167, held the District was precluded from relying on the October 2016 IEP, and instead was required to defend the June 2016 IEP that recommended a 12:1+1 class size. According to the SRO, because the District had offered no evidence that it could provide a 12:1+1 class size, the District failed to offer M.S. a FAPE.[2]

## DISCUSSION

I. Standard of Review

In federal court, parties seeking review of administrative decisions in cases brought under the IDEA usually do so by motion for summary judgment. See Viola v. Arlington Cent. Sch. Dist., 414 F. Supp. 2d 366, 377 (S.D.N.Y. 2006). However, unlike in an ordinary summary

---

[2] The SRO also made an alternative finding because of the lack of caselaw applying R.E. v. N.Y.C. Dep't of Educ. to address "the outer boundaries of a district's ability to modify an IEP using the resolution process in the manner described above." (SRO Dec. at 12). Analyzing the IEP as if the District had successfully amended it in October 2016, the SRO found there were "no defects in the June 2016 IEP that would lead to a denial of a FAPE as it stood when revised after the resolution period." (Id. at 25). Nevertheless, the SRO specified this was merely an alternative finding because "the district failed to provide the parent with a revised IEP recommending the 15:1+1 special class, as well as prior written notice within the resolution period as required by R.E." (Id. at 26).

judgment motion, the existence of a disputed issue of material fact will not necessarily defeat the motion.  Id.  Rather, summary judgment in an IDEA case functions as an appeal from an administrative decision.  T.P. v. Mamaroneck Union Free Sch. Dist., 554 F.3d 247, 252 (2d Cir. 2009).

In this context, the Court (i) reviews the record of the administrative proceedings; (ii) hears additional evidence at the request of a party; and (iii) grants such relief as it deems appropriate based on the preponderance of the evidence.  20 U.S.C. § 1415(i)(2)(C).

"Although the district court must engage in an independent review of the administrative record and make a determination based on a 'preponderance of the evidence,' . . . such review 'is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review.'"  Gagliardo v. Arlington Cent. Sch. Dist., 489 F.3d 105, 112–13 (2d Cir. 2007) (quoting Mrs. B. v. Milford Bd. of Educ., 103 F.3d 1114, 1120 (2d Cir. 1997) and Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley, 458 U.S. at 206).  "To the contrary, federal courts reviewing administrative decisions must give 'due weight' to these proceedings, mindful that the judiciary generally 'lack[s] the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy.'"  Id. (quoting Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley, 458 U.S. at 206, 208) (alteration in original).  Indeed, "the district court's determination of the persuasiveness of an administrative finding must also be colored by an acute awareness of institutional competence and role."  M.H. v. N.Y.C. Dep't of Educ., 685 F.3d 217, 244 (2d Cir. 2012).  "However, the district court is not required to defer to administrative determinations regarding matters of law."  K.H. v. N.Y.C. Dep't of Educ., 2014 WL 3866430, at *15 (E.D.N.Y. Aug. 6, 2014).

II. Tuition Reimbursement

The issue here is whether the Parents are entitled to tuition reimbursement for the 2016–2017 school year.

For the following reasons, the Court finds the Parents are entitled to tuition reimbursement for the 2016–2017 school year.

Claims for tuition reimbursement are "governed by the Burlington/Carter Test, which looks to (1) whether the school district's proposed plan will provide the child with a [FAPE]; (2) whether the parents' private placement is appropriate to the child's needs; and (3) a consideration of the equities." C.F. v. N.Y.C. Dep't of Educ., 746 F.3d 68, 76 (2d Cir. 2014); see generally Sch. Comm. of Burlington v. Dep't of Educ., 471 U.S. at 369; Florence Cty. Sch. Dist. Four v. Carter, 510 U.S. at 12. The school district has the burden of proving its IEP offered the student a FAPE. R.E. v. N.Y.C. Dep't of Educ., 694 F.3d at 184 (citing N.Y. Educ. Law § 4401(c)). If the district "fails to carry this burden, the parents bear the burden of establishing the appropriateness of their private placement and that the equities favor them." Id. at 185.

But first the Court must determine the operative IEP for the 2016–2017 school year: the June 2016 IEP, which recommended a 12:1+1 class, or the October 2016 IEP, which recommended a 15:1+1 class.

As discussed below, the Court finds the June 2016 IEP is the operative IEP. Moreover, because the District was not able to offer the 12:1+1 class recommended in the June 2016 IEP, the Parents are entitled to tuition reimbursement for the 2016–2017 school year. See M.O. v. N.Y.C. Dep't of Educ., 793 F.3d 236, 244 (2d Cir. 2015) (holding "it is not speculative to find

11

that an IEP cannot be implemented at a proposed school that lacks the services required by the IEP").[3]

A.   Operative IEP

The IEP is "a written statement for each child with a disability that is developed, reviewed, and revised in accordance with this section." 20 U.S.C. § 1414(d)(1)(A)(i). "Changes to the IEP may be made either by the entire IEP Team"—which consists of the parents, teachers, a school district representative, and potentially others, id. § 1414(d)(1)(B)—or, with the consent of the parents and the school district, by "develop[ing] a written document to amend or modify the child's current IEP" without convening an IEP meeting, id. § 1414(d)(3)(D), (F). Similarly, when parties resolve a complaint at a resolution meeting, they must execute a legally binding agreement, signed by the parent and a school district representative, that sets forth the resolution. Id. § 1415(f)(1)(B)(iii). Relevant New York regulations also state:

> Amendments to an IEP made after the annual review may be made by rewriting the IEP or by developing a written document to amend or modify the student's current IEP, provided that:
>
> (i) the parent shall receive prior written notice of any changes to the IEP pursuant to section 200.5(a) of this Part;
>
> (ii) the committee on special education shall be notified of any changes made to the IEP pursuant to paragraph (2) of this subdivision; and
>
> (iii) the parent shall receive a copy of the document that amends or modifies the IEP or, upon request, the parent shall be provided a revised copy of the entire IEP with the amendments incorporated.

N.Y. Comp. Codes R. & Regs. tit. 8, § 200.4(g).

---

[3]   The District does not challenge whether Eagle Hill is appropriate to M.S.'s needs. Further, although the District argues the Court may exercise its equitable powers to deny the Parents tuition reimbursement, it does not do so as an element of the Burlington/Carter test. Accordingly, the Court separately addresses the District's argument as to the equities below.

In R.E. v. N.Y.C. Dep't of Educ., the Second Circuit dealt with the issue of whether a school district can modify the IEP through the use of "retrospective testimony." 694 F.3d at 185. Retrospective testimony is "testimony that certain services not listed in the IEP would actually have been provided to the child if he or she had attended the school district's proposed placement." Id. at 185. The court held that "the IEP must be evaluated prospectively as of the time of its drafting and . . . retrospective testimony that the school district would have provided additional services beyond those listed in the IEP may not be considered." Id. at 186. Thus, "testimony regarding state-offered services may only explain or justify what is listed in the written IEP. Testimony may not support a modification that is materially different from the IEP, and thus a deficient IEP may not be effectively rehabilitated or amended after the fact through testimony regarding services that do not appear in the IEP." Id.

The Second Circuit relied on the fact that the IDEA contains a statutory thirty-day resolution period once a due process complaint is filed. R.E. v. N.Y.C. Dep't of Educ., 694 F.3d at 187. The court reasoned the resolution period allows a school district "thirty days to remedy . . . deficiencies without penalty." Id. at 187–88.

> [T]here is no danger that parents will take advantage of a school district by failing to alert it to IEP deficiencies and subsequently recover tuition based on those deficiencies. A school district that inadvertently or in good faith omits a required service from the IEP can cure that deficiency during the resolution period without penalty once it receives a due process complaint.

Id. at 188.

Here, the parties did not amend the June 2016 IEP by jointly developing a written document or legally binding agreement setting forth a resolution. Nevertheless, the District argues under R.E. v. N.Y.C. Dep't of Educ. it was permitted to amend the June 2016 IEP to correct a good faith error: the 12:1+1 class size it allegedly inadvertently carried over from the previous year's IEP. Further, the District argues it properly amended the IEP by (i) orally telling

13

a Parent at the October 7, 2016, resolution meeting that it intended to modify the class size recommended in the June 2016 IEP, (ii) sending a letter on October 21, 2016, confirming the change, and (iii) modifying its own version of the June 2016 IEP during the resolution period to reflect the correct class size.

The Court disagrees. Even if R.E. v. N.Y.C. Dep't of Educ. permits the District to unilaterally amend the IEP during the resolution period, the District failed to do so in any of the three ways described above.

The District's failure to send the Parents a copy of the modified IEP during the resolution period is fatal to its argument that it amended the IEP. New York regulations specifically require that a parent "receive a copy of the document that amends or modifies the IEP." N.Y. Comp. Codes R. & Regs. tit. 8, § 200.4(g). The Parents received no such document during the resolution period.[4] Even the District's October 21, 2017, due process response letter failed to provide that 15:1+1 was the appropriate class size, instead stating "the correct size of special education classes are identified on the IEP issued as a result of the Resolution Session," which the Parents had not yet received. (Dist. Ex. 3 at 3).

Moreover, in R.E. v. N.Y.C. Dep't of Educ., the Second Circuit held that a court's evaluation of the IEP "must focus on the written plan offered to the parents." 694 F.3d at 195. The Circuit has reiterated in other cases: "Parents are entitled to rely on the IEP for a description of the services that will be provided to their child." P.K. ex rel. S.K. v. N.Y.C. Dep't of Educ., 526 F. App'x 135, 141 (2d Cir. 2013) (summary order); see also K.L. ex rel. M.L. v. N.Y.C.

---

[4] The Parents' due process complaint was filed September 26, 2016. Therefore, the 30-day resolution period ended October 26, 2016. The Parents say they received the October 2016 IEP, along with a cover letter dated October 27, 2016, on November 1, 2016, and thus the SRO correctly concluded there was insufficient evidence the District provided the October 2016 IEP by October 26, 2016.

14

Dep't of Educ., 530 F. App'x 81, 85 (2d Cir. 2013) (summary order) ("In most cases, parents make this difficult decision on the basis of the IEP. Accordingly, at this moment of parental decision-making, the IEP must offer the student a FAPE on its own terms."). Allowing the District to unilaterally amend the IEP without sending the Parents a copy of the IEP would "undermine [the IEP's] function of giving notice of the services the school district has agreed to provide and measuring the student's progress toward the goals outlined in the IEP" and "vitiate[] the parents' right to participate at every step of the IEP drafting process." M.C. by and through M.N. v. Antelope Valley Union High Sch. Dist., 858 F.3d 1189, 1197 (9th Cir. 2017).

The District argues the October 2016 IEP is not, in fact, retrospective testimony, because the Parents were aware the District intended to provide a 15:1+1 class size as of the June 9, 2016, CSE meeting.

However, the evidence is far from clear that the Parents understood the class size to be 15:1+1 when they received the June 2016 IEP. Even if the Parent left the CSE meeting with the impression that the CSE had recommended a 15:1+1 class size, she testified that when she received the June 2016 IEP on August 30 or 31, 2016, which explicitly recommended a 12:1+1 class size, she was confused, and thought the District had either made a mistake or changed its recommendation. The Parent's confusion is understandable given that in addition to the provisions in the IEP, the prior written notice also stated the class size would be 12:1+1.

In addition, the September 26, 2016, due process complaint evidences the Parents' understanding that the District was recommending a 12:1+1 class size: the complaint does not identify the June 2016 IEP class size as an error, but does identify as an error the fact that the June 2016 IEP states that M.S. was not taking ADHD medication.

15

If anything, the confusion caused by the District's alleged error emphasizes the need for an accurate, written IEP, upon which, as the Second Circuit has clearly stated, the Parents can rely. "The IEP is a 'formal, written offer [that] creates a clear record that will do much to eliminate troublesome factual disputes . . . about when placements were offered, what placements were offered, and what additional education assistance was offered to supplement a placement, if any.'" M.C. by and through M.N. v. Antelope Valley Union High Sch. Dist., 858 F.3d at 1196–97.

Finally, the District argues the Parents were not prejudiced by the class size error in the June 2016 IEP or by the District's unilateral modification, as the Parents later rejected the 15:1+1 class size. The District relies on this Court's decisions in M.P. v. Carmel Cent. Sch. Dist., 2016 WL 379765, at *5 (S.D.N.Y. Jan. 29, 2016) (Briccetti, J.), and McCallion v. Mamaroneck Union Free Sch. Dist., 2013 WL 237846, at *8 (S.D.N.Y. Jan. 22, 2013) (Briccetti, J.), in which the Court relied on IEPs developed after the parents' enrollment decisions. But those cases are distinguishable because the IEPs were properly amended through CSE meetings prior to the start of the school year. See M.P. v. Carmel Cent. Sch. Dist., 2016 WL 379765, at *2, 5; McCallion v. Mamaroneck Union Free Sch. Dist., 2013 WL 237846, at *5, 8. This case, by contrast, presents the risk of a "bait and switch," because the Parents did not consent to the modification and did not receive the October 2016 IEP with its revised class size recommendation until well after the beginning of the school year. As the Second Circuit stated in R.E. v. N.Y.C. Dep't of Educ.:

> Under the [District's] view, a school district could create an IEP that was materially defective, causing the parents to justifiably effect a private placement, and then defeat the parents' reimbursement claim at a Burlington/Carter hearing with

16

> evidence that effectively amends or fixes the IEP by showing that the child would, in practice, have received the missing services.

694 F.3d at 186.

Accordingly, the June 2016 IEP is the operative IEP. Further, because the District acknowledged it was unable to offer the 12:1+1 class recommended in the June 2016 IEP, the Parents are entitled to tuition reimbursement for the 2016–2017 school year.

B. Equities

The District argues the Court should exercise its equitable powers to deny the tuition relief that the SRO awarded to the Parents.

The Court declines to do so.

Under 20 U.S.C. § 1415(i)(C)(iii), a court "shall grant such relief as the court determines is appropriate." "The only restriction is that 'the relief is to be appropriate in light of the purpose of the Act.'" Doe v. E. Lyme Bd. of Educ., 790 F.3d 440, 454 (2d Cir. 2015) (quoting Sch. Comm. of Burlington v. Dep't of Educ., 471 U.S. at 369). "[E]quitable considerations are relevant in fashioning relief and the court enjoys broad discretion in so doing." Id. (quoting Florence Cty. Sch. Dist. Four v. Carter, 510 U.S. at 16) (alteration in original). "Important to the equitable consideration is whether the parents obstructed or were uncooperative in the school district's efforts to meet its obligations under the IDEA." C.L. v. Scarsdale Union Free Sch. Dist., 744 F.3d 826, 840 (2d Cir. 2014) (considering the equities in Burlington/Carter analysis).

The District argues the Parents were aware as of June 9, 2016, that the District intended to recommend a 15:1+1 class size. Moreover, the District takes umbrage at the Parents' refusal to agree to modification of the June 2016 IEP at the October 7, 2016, resolution meeting.

The District's umbrage is seriously misplaced. As discussed above, the record does not show the Parents understood the June 2016 IEP to recommend a 15:1+1 class size. Further, the

17

Parents were under no obligation to agree to change the June 2016 IEP at the resolution meeting. Finally, there is no indication the Parents were uncooperative in the District's efforts to meet its obligations under the IDEA.

Accordingly, the Court will not exercise its equitable powers to deny the Parents tuition relief.

## CONCLUSION

The Parents' motion for summary judgment is GRANTED.

The District's motion for summary judgment is DENIED.

The Court affirms the decision of the SRO and dismisses the complaint.

The District is ORDERED to provide direct funding or reimbursement of M.S.'s tuition at the Eagle Hill School for the 2016–2017 school year.

The Clerk is instructed to terminate the motions (Docs. ##21, 24) and close this case.

Dated: January 23, 2019
       White Plains, NY

                       SO ORDERED:

                       _____
                       Vincent L. Briccetti
                       United States District Judge